# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 16-0854V
Filed: August 15, 2018
PUBLISHED

| | |
|---|---|
| LESLIE DOBBINS,<br><br>      Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>      Respondent. | Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Tetanus-Diphtheria-acellular Pertussis (Tdap) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Paul R. Brazil*, Muller Brazil, LLP, Dresher, PA, for petitioner.
*Robert Paul Coleman, III*, U.S. Department of Justice, Washington, DC, for respondent.

## **DECISION AWARDING DAMAGES**[1]

**Dorsey**, Chief Special Master:

  On July 20, 2016, petitioner filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*,[2] (the "Vaccine Act"). Petitioner alleges that she suffered from a right shoulder injury as a result of receiving a tetanus-diphtheria-acellular pertussis ("Tdap") vaccination on September 21, 2015. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

  On September 6, 2017, the undersigned issued a ruling on entitlement, finding petitioner entitled to compensation for her shoulder injury related to vaccine administration ("SIRVA"). The only issues remaining before the undersigned are the amount of damages that petitioner should be awarded in compensation for (1) past and future pain and suffering and (2) out-of-pocket expenses. For the reasons described

---

[1] Because this decision contains a reasoned explanation for the action in this case, the undersigned intends to post it on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all "§" references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

below, the undersigned finds that petitioner is entitled to an award of damages in the amount of **$128,143.80**, which is comprised of (1) $125,000.00 for pain and suffering and (2) $3,143.80 for out-of-pocket expenses.

## I. Procedural History

On September 5, 2017, respondent filed his Rule 4(c) report in which he conceded that petitioner was entitled to compensation in this case. Respondent's Rule 4(c) Report at 1 (ECF No. 28). On September 6, 2017, the undersigned issued a ruling on entitlement finding petitioner entitled to compensation for her SIRVA (ECF No. 29).

Prior to respondent's concession, the parties informally attempted to agree on damages but reached an impasse. Damages and Pre-Hearing Order, filed Sept. 20, 2017 (ECF No. 30). The parties agreed that a damages hearing was appropriate. *Id*. Thus, a damages hearing was scheduled for February 21, 2018. Petitioner filed her brief on damages on November 6, 2017 (ECF No. 32) and respondent filed his brief on January 19, 2018 (ECF No. 36).

The undersigned held a damages hearing on February 21, 2018, during which petitioner testified. Transcript of Proceedings held on February 21, 2018 ("Tr."). Following the hearing, the undersigned issued an order directing petitioner to file additional records. Scheduling Order, filed Feb. 21, 2018 (ECF No. 39). Petitioner filed additional records on March 23, 2018 and April 24, 2018 (ECF Nos. 42, 45).

On May 10, 2018, the undersigned issued an order allowing the parties to file additional evidence by May 24, 2018 and indicating that after that date, the record would be closed. Scheduling Order, issued May 10, 2018 (ECF No. 47). On May 22, 2018, petitioner filed Exhibit 13 detailing her claimed out-of-pocket medical expenses (ECF No. 48). In an informal email communication on June 22, 2018, respondent confirmed that he does not object to an award of these expenses, provided supporting documentation is provided.

Petitioner filed an updated list of expenses on July 26, 2018, increasing the amount requested for out-of-pocket medical expenses. Pet. Ex. 14. On the same day, petitioner also filed a motion for an extension of time, until August 9, 2018, to file additional documentation. Motion for Enlargement, filed July 26, 2018 (ECF No. 51). This motion was granted. Scheduling Order, issued July 27, 2018 (ECF No. 52). Petitioner did not file any additional documentation or a request for additional time to do so by that deadline. This case is now ripe for a determination concerning petitioner's damages.

## II. Factual History

Petitioner received a Tdap vaccine on September 21, 2015 at a Rite Aid Pharmacy in Ocean Springs, Mississippi. Petitioner's Exhibit ("Pet. Ex.") 1 at 3. At the time of vaccination, petitioner was 56 years old and had no history of shoulder problems. Petition at 3; *see generally* Pet. Ex. 2.

Three weeks later, on October 16, 2015, petitioner presented to Dr. Donnis Harrison at Bienville Orthopaedic Specialist LLC for complaints of right shoulder pain.

2

Pet. Ex. 2 at 19, Pet. Ex. 3 at 3.  Petitioner reported that the pain had an aching, sharp, dull, burning, stabbing, and throbbing quality.  *Id.*  Petitioner reported the pain to be mild to moderate in severity and intermittent.  *Id.*  Petitioner stated that the pain interfered with activity and was aggravated by raising her arm up or overhead.  *Id.*  On examination of petitioner's right shoulder, Dr. Harrison noted that there was localized tenderness to palpation present in the subacromial space and no swelling present.  Pet. Ex. 2 at 21, Pet. Ex. 3 at 5.  Dr. Harrison tested her active range of motion and found it was limited and painful.  *Id.*  Her active abduction was 30-60 degrees, active forward elevation was 61-90 degrees, and active external rotation was 45-65 degrees.  *Id.*  Dr. Harrison noted that petitioner's strength was limited due to pain and she had positive impingement signs on the Neer and Hawkins' tests.  *Id.*  Dr. Harrison diagnosed petitioner with right shoulder bursitis, impingement syndrome of the right shoulder, and osteoarthritis of the right shoulder region.  Dr. Harrison gave petitioner an injection of Depo Medrol in her right shoulder, ordered shoulder x-rays, prescribed Mobic, and recommended conservative treatment with stretching exercises, range of motion exercises, strengthening exercises, activity modification, rest, and cold and/or heat application. Pet. Ex. 2 at 21-22, Pet. Ex. 3 at 5-6.

On October 20, 2015 Dr. Harrison ordered a right shoulder MRI without contrast.  Pet. Ex. 3 at 9.  An MRI was performed on October 29, 2015 at Cedar Lake MRI in Biloxi, Mississippi.  *Id.* at 10.  The MRI impression included a full-thickness partial tear of the supraspinatus tendon extending to the bursal surface, bursal surface fraying and partial thickness tear of the tendon, tear of the posterior aspect of the inferior glenohumeral ligament, and moderate sized joint effusion with synovitis and possible small loose bodies.  *Id.* at 11.

On October 30, 2015, petitioner returned to Dr. Harrison to review the MRI findings.  Pet. Ex. 2 at 25-28, Pet. Ex. 3 at 14-17.  Petitioner reported no change since her last visit, and continued to report joint pain, muscular weakness, muscle pain, and limitation of motion.  Pet. Ex. 2 at 25-26, Pet. Ex. 3 at 14-15.  On examination, Dr. Harrison found that petitioner's right shoulder continued to exhibit pain with range of motion, limited range of motion, and positive Neer and Hawkins' impingement signs.  Pet. Ex. 2 at 26, Pet. Ex. 3 at 15.  For active range of motion, he determined her abduction was limited to 30 to 60 degrees, forward elevation was limited to 61-90 degrees, and active external rotation was limited to 45-65 degrees.  *Id.*  He found that her strength remained limited secondary to pain.  *Id.*  Dr. Harrison noted that the MRI showed a "[r]ight, medium full thickness rotator cuff tear, supraspinatus muscle, AC Joint DJD."  Pet. Ex. 2 at 27, Pet. Ex. 3 at 16. Dr. Harrison added a diagnosis of acute right rotator cuff tear to his prior diagnoses.  *Id.*  Dr. Harrison scheduled arthroscopic surgery of petitioner's right shoulder.  *Id.*

On November 2, 3 and 4, 2015, petitioner was seen at the American College of Acupuncture and Oriental Medicine for complaints of limited range of motion in her right shoulder.  Pet. Ex. 10 at 12-19.  At her shoulder examination on November 2, 2015, she reported that she got a shot on September 21 and it became painful that night.  *Id.* at 16.  She reported that a cortisone shot with lidocaine did nothing and that an MRI showed a torn rotator cuff.  *Id.*  She reported pain that varied between 2/10 and 8/10, and noted that with movement the pain was 7-8/10.  *Id.*  She was given a plan of treatment involving acupuncture five times a week.  *Id.*  She attended additional

3

sessions on November 3 and 4, 2015. *Id.* at 12-15. The record contains no evidence that she attended further acupuncture sessions for her shoulder problem.

On November 10, 2015, Dr. Harrison performed arthroscopic surgery on petitioner's right shoulder. Pet. Ex 2 at 29, Pet. Ex. 3 at 21. Dr. Harrison performed a right arthroscopic rotator cuff repair, arthroscopic distal clavicle resection, arthroscopic subacromial decompression, and arthroscopic biceps tenodesis.[3] *Id.* The procedures were performed under general anesthesia and there were no complications. Pet. Ex. 2 at 30, Pet. Ex. 3 at 22. Several portals were established, and a camera was placed in the subacromial space. *Id.* During the surgery, Dr. Harrison visualized a full thickness tear involving the supraspinatus and subscapularis. *Id.* He noted that the "biceps tendon insertion was unstable with significant labral pathology in the intraarticular aspect" of petitioner's shoulder. *Id.* The "biceps tendon was split with a spinal needle and released off the anterior superior" labrum. *Id.* Dr. Harrison debrided the anterior superior and posterior superior labrum back to stable edges using a shaver. *Id.* Dr. Harrison used a hooded burr to perform an acromioplasty[4] and a complete bursectomy[5] was performed. *Id.* A biceps tenodesis was also performed. *Id.* Finally, he repaired the rotator cuff and performed a distal clavicle resection. *Id.*

Petitioner had post-operative follow-up visits to Dr. Harrison on November 18 and December 1, 2015. Pet. Ex. 2 at 32, Pet. Ex. 3 at 24, 28. At the December 1, 2015 appointment, her strength and range of motion remained limited due to pain. Pet Ex. 2 at 35.

On December 1, 2015, petitioner presented to Ocean Springs Hospital Rehabilitation Center in Ocean Springs, Mississippi for a physical therapy evaluation with physical therapist Erin Moody. Pet. Ex. 5 at 3; *see also* Pet. Ex. 2 at 36-38 and Pet. Ex. 3 at 25-27. She reported an onset of shoulder pain after an immunization in September 2015. She rated her current level of pain at 1 on a scale of 1-10 and reported that she had been taking pain medication regularly. Pet. Ex. 5 at 3. She was assessed as having decreased range of motion, decreased strength, pain, and abnormal posture. *Id.* Her passive range of motion in her right shoulder was 75 degrees in flexion, 75 degrees in abduction, zero degrees in external rotation, and ten degrees in internal rotation. *Id.*

The physical therapist established a treatment plan where petitioner would be seen 2-3 times a week for 4-6 weeks. *Id.* at 4. Petitioner's treatment plan included a progression of home exercises, instruction on posture and body mechanics, manual

---

[3] Tenodesis is "the stabilization of a joint by anchoring a tendon to a bone, done either surgically or through use of an orthosis." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY ("DORLAND'S") at 1882 (32nd ed. 2012).

[4] Acromioplasty is the "surgical removal of an anterior spur of the acromion to relieve mechanical compression of the rotator cuff during movement of the glenohumeral joint." DORLAND'S at 20.

[5] A bursectomy is the "excision of a bursa." DORLAND'S at 264. A bursa is "a sac or saclike cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop." DORLAND'S at 262. SIRVA injuries may involve vaccine injection into the subdeltoid bursa, resulting in bursitis, or inflammation of the bursa. *See* B. Atanasoff et al., *Shoulder injury related to vaccine administration (SIRVA)*, 28 Vaccine 8049 (2010).

therapy to improve range of motion and strength, and the use of modalities as needed for pain and inflammation to include electrical stimulation, iontophoresis,[6] phonophoresis,[7] and moist heat and ice as appropriate. *Id.*

Petitioner had additional physical therapy sessions at Ocean Springs on December 4, 7, 9, 10, 14, 16, 17, 21, 22, 28, and 29, 2015   Pet. Ex. 5 at 5-19. During this time, she reported pain levels between 1-3 on a scale of 1-10. *Id.* At her December 14, 2015 session she reported that she had slipped and fallen from a ladder the day before, but indicated that the incident had not worsened her shoulder pain. *Id.* at 11. At her December 28, 2015 appointment she reported that she may be going out of town for several weeks to visit her mother, who was sick. *Id.* at 17.

Petitioner testified that she traveled to Texas on New Year's Eve, which was approximately six weeks following her shoulder surgery, because her mother had fallen ill. Tr. at 31-32. Petitioner testified that she cared for her mother at night during this time and her shoulder injury affected her ability to do so. Tr. at 33. Petitioner testified that she "had to do a lot of it with my left hand." *Id.* She testified that she had recurring nightmares about an incident where her mother fell, and, in her nightmares, petitioner was unable to catch her mother. Tr. at 34.

On January 7, 2016, petitioner reported for a physical therapy evaluation with physical therapist ("PT") Rosa Del Pino at Memorial Hermann Sports Medicine & Rehabilitation in Sugar Land, Texas. Pet. Ex. 4 at 8. Petitioner reported that she had difficulty with daily activities, joint stiffness, muscle tenderness, muscle weakness, and shoulder pain. *Id.* She reported that she had flu and whooping cough vaccinations and experienced severe pain the next afternoon. *Id.* The evaluation noted that petitioner "currently lives in Ocean Springs, MS but [is] here visiting parents, for 1-2 months, as mom was recently diagnosed" with cancer. *Id.* Petitioner reported that her pain levels were, at best 0/10, at worst 4/10, and currently 1/10. *Id.* Her active range of motion in her right shoulder was 45 degrees in forward flexion and 42 degrees in abduction. In passive range of motion, her right shoulder was limited to 90 degrees in forward flexion, 68 degrees in abduction, and 25 degrees in external rotation, all with a capsular end feel. *Id.*

On examination of petitioner's right shoulder, PT Del Pino found that petitioner had moderate scar tissue adherence and that her posterior, lateral, and inferior glides were all "severely hypomobile." *Id.* at 9. PT Del Pino noted that petitioner had problems with range of motion, muscle strength, posture, poor body mechanics, and joint mobility. *Id.* The evaluation noted functional limitations including difficulty in performing self-care activities of daily living and decreased safety during functional activities. *Id.* PT Del Pino's clinical impression was that petitioner had "severe adhesive capsulitis." *Id.* at 9. A plan of care was established for petitioner to attend physical therapy three times a week for four weeks. Her treatment was to involve therapeutic exercises, functional activities, neuromuscular reeducation, manual therapy, group therapy, cold packs, hot packs, and electrical stimulation *Id.* at 6, 10.

---

[6] Iontophoresis is "the introduction by means of electric current, of ions of soluble salts into the tissues of the body, often for therapeutic purposes." DORLAND'S at 958.

[7] Phonophoresis is "the transdermal introduction of a topical agent into the body using mechanical energy supplied by ultrasound." DORLAND'S at 1435.

Petitioner attended additional physical therapy sessions at Memorial Hermann on January 8, 12, 13, 15, 18, 20, 22, 25, 27, and 29 and February 1, 3, 8, 10, 12, 15, 17, 23, 24, and 26, 2016  Pet. Ex. 4 at 11-71.  On January 8, 2016, she reported a pain level of 0 both before and after treatment but also reported, "I don't even feel my arm." *Id.* at 11.  On January 12, 2016, petitioner reported a pain level of 2 before treatment and 1 after treatment.  *Id.* at 13.  She also reported that on "Saturday night, [I] was trying to get [my mother] up and into the wheelchair and her legs gave way and I caught her with both arms."  *Id.*

On January 13, 2016, petitioner reported a pain level of 1 before treatment and 0 after treatment.  Pet. Ex. 4 at 15.  Petitioner was "able to increase flex ROM from 80° initially to >90° post mobilizations and PROM [passive range of motion]."  *Id.* at 16.  She stated that "she has been unable to perform HEP [home exercise program] due to her caring for her mother, as she is now the primary caretaker overnight therefore she does not get much rest."  *Id.* at 15.  Petitioner reported being demoralized due to her personal life, presumably meaning her mother being critically ill, and her shoulder issues, but that after coming to physical therapy the day before she felt motivated to move forward as her range of motion improved.  *Id.*  At her January 15, 2016 visit, petitioner reported a pain level of 0.5/10 and stated that after her last treatment session she had "experienced her first pain free night since 9/21/15." *Id.* at 17.  The physical therapist noted that petitioner "responded well to last treatment, as she is now pain free."  *Id.* at 18.  On January 18, 2016, petitioner reported a current pain level of 1/10.  Pet. Ex. 4 at 37.  Petitioner reported that she tripped and fell into bushes on her right side while playing basketball with a six year old relative.  *Id.*

On January 20, 2016, petitioner "reported no pain prior to or after treatment. P[atien]t stated that her shoulder felt 'energized' after last treatment session. P[atien]t stated that her shoulder feels loose . . . her trigger point pain has decreased in intensity but still painful to palpation."  Pet. Ex. 4 at 19.

At her January 22, 2016 physical therapy visit, petitioner reported a pain level of 0-0.5/10 and stated that she was experiencing less discomfort with activities in the home such as transferring her mother.  *Id.* at 22.  Petitioner reported that she was feeling stronger and did not think much about activities/lifting prior to performing them. *Id.*  The physical therapist noted that petitioner was "eager to perform higher intensity exercises as she is motivated to return to playing tennis (is now questioning when she would be able to return)."  *Id.*  The physical therapist informed petitioner that "full ROM [range of motion] must be restored and shoulder shrug sign must be abolished before returning to play tennis/simulate tennis activities."  *Id.* at 23.

At her January 25, 2016 session, petitioner stated that her pain was 0/10 but that it had flared up to 2/10 over the weekend.  Pet. Ex. 4 at 25.  On January 27, 2016, she reported a pain level of 2/10, which she attributed to stress from her mother's condition. *Id.* at 28.  Petitioner reported that her mother's status was "continuing to decline" and that she was "unsure of how much longer she has left and is fearful that she will pass any day now."  *Id.*  The physical therapist noted that petitioner was extremely emotional and "began crying while speaking about her mother's condition."  *Id.* at 29. Nevertheless, petitioner was able to complete her exercises without increased pain.  *Id.* The physical therapist noted that there was an increase in petitioner's passive range of

6

motion for external rotation and internal rotation.  *Id.*  On January 29, 2016, petitioner reported pain of 2/10.  *Id.* at 31.  After treatment, she reported her pain as 0/10.  *Id.*

On February 1, 2016, petitioner reported a pain level of 1/10.  Pet. Ex. 4 at 34.  She reported that she lifted and moved her 80 pound mother over the weekend.  *Id.*  She stated that she could now "place a ponytail in the center of her head (as opposed to placing on the right side out of inability to complete such)."  *Id.*  The physical therapist noted that her range of motion was continuing to improve but that "[s]houlder shrug sign persists in pure abduction and in more elevated (flexed) GH [glenohumeral] positions."  *Id.* at 35.

On February 3, 2018, petitioner stated that her pain was 2/10 because she aggravated her shoulder when entering a car.  Pet. Ex. 4 at 40.  After treatment, her pain level was 1/10.  *Id.*  On February 8, 2016, petitioner reported a pain level of 2/10.  *Id.* at 45.  Petitioner stated that her pain was at 0/10 before she reinjured her shoulder picking up her 25 pound cat.  *Id.*  Petitioner reported that she had slept on her right arm briefly for the first time since before surgery.  *Id.*  The physical therapist re-evaluated petitioner on February 8, 2018 and determined that petitioner had not met her passive range of motion ("PROM") goals but had made significant improvements.  *Id.* at 49.  Functionally, petitioner no longer had right shoulder pain while driving.  *Id.*  The physical therapist noted that petitioner had "not been able to play tennis since her surgery so such goal could not be safely assessed at this time."  *Id.*

On February 10, 2016, petitioner reported a pain level of 1/10 before treatment and 0/10 after treatment.  Pet. Ex. 4 at 50.  Petitioner stated that she was completing exercises twice daily.  *Id.*  Petitioner reported having to do more for her mother because her mother was less functional and in her final days.  *Id.*  On February 12, 2016, petitioner reported a pain level of 0/10 before her session and 1/10 after treatment.  *Id.* at 53.  Petitioner reported that her mother had taken a turn for the worse and that she could lose her mother that weekend.  *Id.*  On February 12, 2016, petitioner reported pain of 0/10 before treatment and 1/10 after treatment due to scar irritation.  Pet. Ex. 4 at 53.

On February 15, 2016, petitioner stated that her pain was 0/10 because she was not "checking into the pain due to her mother's passing."  Pet. Ex. 4 at 56.  On February 17, 2016, petitioner reported pain of 2/10 and noted that she was prepared for her mother's funeral the following day.  Pet. Ex. 4 at 59.  Petitioner's pain level was 0/10 after treatment.  *Id.*  The physical therapist assessed that petitioner continued to have moderate adherence and educated petitioner on proper scar tissue mobilization technique.  *Id.*

On February 23, 2016, petitioner reported that she was cleaning out her mother's closet which resulted in her moving, pushing/pulling, and carrying multiple items without increased difficulty.  Pet. Ex. 4 at 62.  Petitioner stated that she would be leaving town that week to return to Mississippi and that she planned to resume therapy at a clinic there.  *Id.*  She reported a pain level of 2/10 before treatment and 0/10 after treatment.  *Id.*  On February 24, 2016, petitioner reported a pain level of 1/10 before treatment due to closet cleaning and 0/10 after treatment.  Pet. Ex. 4 at 65.  The physical therapist noted that petitioner responded well to treatment.  *Id.* at 66.  The therapist assessed that she continued to exhibit decreased PROM but was able to perform daily activities without increased difficulty.  *Id.*

At her final physical therapy session at Memorial Hermann on February 26, 2016, petitioner reported pain of 0/10 both before and after treatment. Pet. Ex. 4 at 68. At this visit, her active range of motion in her right shoulder had improved to 124 degrees in forward flexion and her passive range of motion was 162 degrees in forward flexion, 52 degrees in abduction, 55 degrees in external rotation, and 71 degrees in internal rotation, all with a capsular end feel. Id. The physical therapist noted that she had shown functional improvement and increased her end range of motion. Id. at 70. While petitioner remained unable to reach above her shoulder height in abduction, she had been able to eliminate all pain with driving/steering and the only remaining issue while driving was with reaching her purse on the passenger seat while seated. Id.

After the February 26, 2016 visit, it appears that petitioner returned to her home in Mississippi. See Ex. 4 at 63 (noting that petitioner was advised to transfer her treatment to a Mississippi physical therapy clinic, the location to which she was returning).

On March 1, 2016, Dr. Harrison ordered additional physical therapy for petitioner's right shoulder two to three times a week for three to four weeks. Pet. Ex. 3 at 31. Petitioner presented to Dr. Harrison on March 4, 2016 reporting aching and stating that the symptoms had improved since her last visit. Id. at 32. On examination, Dr. Harrison noted that her arthroscopy incisions were healed. Id. at 34. Dr. Harrison found petitioner exhibited "mild limitation of ROM [range of motion]," with active abduction of 90-130 degrees, active forward elevation of 121-150 degrees, and active external rotation of 45-65 degrees. Id. Dr. Harrison also found "mild limitation in strength," and negative Neer and Hawkins tests. Id.

On March 9, 2016, petitioner returned to Ocean Springs Hospital Rehabilitation Center in Mississippi and was re-evaluated. Pet. Ex. 5 at 20. On re-evaluation, her active range of motion in her right shoulder was 115 degrees in flexion, 40 degrees in extension, 80 degrees in abduction, and 40 degrees in external rotation. Id. Her passive range of motion was 120 degrees in flexion and abduction, 45 degrees in external rotation, and 40 degrees in internal rotation. Id. Her strength was 3-/5 in her right shoulder in all planes. Id. She attended additional physical therapy sessions at Ocean Springs on March 11, 14, 16, 18, 29, 30, and April 1, 4, 5, 7, 11, 13, 15, 18, 20, and 29, 2016   Pet. Ex. 5 at 22-43.

At petitioner's March 9, 2016 session, she reported "mild intermittent anterior shoulder pain and stiffness and weakness in the shoulder." Pet. Ex. 5 at 20. She reported difficulty performing tasks above her head such as reaching into a cabinet and brushing her hair. Id. On examination, her active range of motion ("AROM") in flexion was 115 for her right shoulder, compared to 180 degrees for her left shoulder. Id. She also exhibited decreased AROM in extension, abduction, external rotation, and decreased PROM in all planes. Id. Her shoulder strength in all planes was 3-/5 in her right shoulder, compared to 5/5 for her left shoulder. Id. The physical therapist assessed petitioner to have decreased ROM, decreased strength, abnormal tone, and pain. Id. at 21. A treatment plan was established for petitioner to perform a progression of home exercises, receive instruction on posture and body mechanics, receive manual therapy to improve ROM and decrease abnormal muscle tone, therapeutic activities to

improve ROM and strength, and the use of other modalities as needed for pain and inflammation. *Id.*

On March 11, 14, and 16, 2016, petitioner reported a pain level of 1-2/10. Pet. Ex. 5 at 22, 24-25. On March 18, 2016, she reported pain of 2-3/10. *Id.* at 26. On March 28, 2018, she reported a pain level of 2/10. *Id.* at 28. On March 30 and April 1, 2016, petitioner reported a pain level of 1/10. *Id.* at 29, 30. On April 4, 2016 she reported a pain level of 1-2/10. *Id.* at 31-32. Petitioner reported that she was pleased with her progress, although it was slow. *Id.* On April 5, 2016, petitioner reported pain of 1/10 and stated that she was eager to return to tennis. *Id.* at 33. The physical therapist assessed her as having full PROM, AROM within normal limits, and reduced strength of 3/5. *Id.* The therapist noted "[s]ignificant progress the past few weeks with improve[ment of] PROM to WNL [within normal limits]. Strength has improved to 3/5. She would benefit from continued strengthening." *Id.*

On April 7, 2016, petitioner reported a pain level of 1/10. Pet. Ex. 5 at 34. On April 11, 2016, petitioner reported a pain level of 0-1/10 and that she was engaging in increased activity at home without increased pain or discomfort. *Id.* at 35. On April 13, 2016, petitioner reported a pain level of 1/10 and noted that she was planning to play a game of tennis in the next week in order to qualify for a state competition. *Id.* at 37. On April 15, 2016, petitioner reported pain of 0/10. *Id.* at 38. On April 18, 2016, petitioner reported pain of 0/10 and stated that she would be playing tennis that evening in order to qualify for a state competition. *Id.* at 39. The physical therapist assessed that she was "[p]leased with ROM. Improved strength noted. Feel this [patient] is ready to resume tennis, however explained to [patient] that [she] may fatigue easily." *Id.*

On April 20, 2016, petitioner reported pain of 0/10 and reported "playing tennis on Monday without difficulty." Pet. Ex. 5 at 40. At her next visit, on April 29, 2016, petitioner reported pain of 0/10. *Id.* at 42. Petitioner was assessed to have right shoulder AROM within functional limits and strength of 4+/5 overall. *Id.* Petitioner was discharged and instructed to continue her home exercise program independently. *Id.* at 43.

On July 8, 2016, petitioner saw nurse practitioner Jillian Kimbrell for a cough. Pet Ex. 11 at 26-29; Pet. Ex. 12 at 34-37. The records of the visit do not mention any problems with her shoulder. Upon physical exam her musculoskeletal system was noted to have "normal range of motion . . . no edema or tenderness." Pet. Ex. 11 at 28; Pet. Ex. 12 at 36. On June 15, 2017, petitioner saw Dr. William McClendon, Jr. for sinus congestion and a sore throat. Pet. Ex. 8 at 2. She reported chronic bilateral knee pain but the records contain no mention of a shoulder problem. *Id.* Thus, it appears that while petitioner suffered a painful shoulder injury, with surgery and physical therapy her injury had largely resolved by July 2016.

Petitioner provided testimony on the impact her injury had on a real estate brokerage she started prior to vaccination. Tr. at 34-39. However, petitioner's counsel clarified during the hearing that petitioner is not making a claim for lost wages. Tr. at 40, 60.

Petitioner testified concerning the effect her shoulder injury had on her ability to play tennis. She testified that prior to her September 2015 Tdap vaccination, she

played tennis three to six times per week for two to two and a half hours. Tr. at 5. She explained that she played tennis for her physical health and for social reasons. Tr. at 6-7.

Petitioner testified that she began playing tennis in 2000 and joined a league in 2002. Tr. at 45-46. She started on a lower level team and, over the years as she improved, progressed to a higher level. Tr. at 46. She testified that, because of her shoulder injury, she missed her team's state championship. Tr. at 12-13. She testified that her team qualified for the state championship but that she "was having surgery in – or had the injury and was having physical therapy when that state tournament was. So I didn't get to go." Tr. at 13. She testified that her team was short on players due to her absence. *Id.*

Petitioner testified that on another occasion she was offered a spot on a league tennis team but declined because of her reduced playing ability. Tr. at 7-8. At the time of the hearing, she indicated that the team in question was "going to state next weekend and I'm not going." Tr. at 7-8. Petitioner testified that missing out on that tournament made her feel like she "could produce tears right here." Tr. at 8.

Petitioner testified that her shoulder injury also affected her ability to paint. Tr. at 22. Petitioner testified that for the past seven-eight years she has taken an interest in painting. *Id.* Prior to her vaccination, she painted three or four times a week. Tr. at 23. She testified that she was unable to paint for almost a year after her vaccination. Tr. at 27.

### III. Contentions of the Parties

Petitioner seeks reimbursement of out-of-pocket medical expenses totaling $3,143.80. Pet. Ex. 14. This amount has varied over time, but respondent has consistently indicated a lack of objection to reimbursement of such expenses to the extent that they are supported by documentation. *See* Res. Brief at 1 fn.1; Informal Communication from Respondent's counsel dated June 22, 2018. The undersigned has reviewed the documentation submitted pertaining to these expenses and finds it adequate. Thus, the undersigned finds that the total amount requested for these expenses is reasonable.

Petitioner asserts that she is entitled to $145,000.00 for past pain and suffering and $40,000.00 for future pain and suffering. Pet. Brief at 10. Petitioner emphasizes that while she was recovering from her injury, her mother fell ill and entered home hospice care. Pet. Brief at 7. Petitioner assumed the responsibility of caring for her mother and endured "regular and consistent pain" while caring for her mother. *Id.* Petitioner participated in physical therapy for four months. *Id.*

Petitioner also asserts that her injury has resulted in her missing out on playing tennis, a sport which she participated in for approximately eight years prior to her vaccination. *Id.* at 8. Petitioner states that she was unable to participate in a tournament following her vaccination injury and had to relinquish her spot on the team. *Id.* Petitioner states that she "never regained her pre-vaccination level of play." *Id.* Petitioner provides her United States Tennis Association statistics and states that her

10

play "declined both in frequency and quality." *Id.*; Pet. Ex. 8. Petitioner states that she decided to forego playing in the 2018 season because her performance had become "personally unacceptable." Pet. Brief at 8. She states that a sport that formerly was fun and exhilarating had become a "source of frustration and anxiety." *Id.* Petitioner states that she "greatly misses the camaraderie that tennis provided." *Id.* at 9.

Finally, petitioner states that she was a talented painter and that her painting suffered due to her injury. *Id.* She states that she "virtually ceased painting completely for over one year, and could not produce any notable paintings until May of 2017." *Id.*

Petitioner asserts that she lost her two primary sources of enjoyment, painting and playing tennis, including the friendships and social events that came along with them. *Id.* She states that she is "now an outsider to the tennis and art co-op social circles." *Id.* She states that her injury has "deprived her of enjoyment, friendship, physical fitness, and a sense of purpose." *Id.*

Respondent proposes a pain and suffering award of $95,000.00. Respondent asserts that petitioner's initial complaints of right shoulder pain were relatively mild and that petitioner underwent successful arthroscopic surgery which left her feeling and doing well post-operatively. Res. Brief at 5. Respondent notes that petitioner was able to lift and move her 80 pound mother by February 1, 2016 and was discharged from rehabilitation services on April 29, 2016 with no pain reported. *Id.*

### IV.    Discussion

#### A.    Pain and Suffering Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-92V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Medical records are the most reliable evidence regarding a petitioner's medical condition and the effect it has on her daily life. *Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections.")

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125 at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), *originally issued* Apr. 19, 2013 ("*I.D.*") ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-172V, 1996 WL 300594 at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases

11

cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. *See I.D.*, 2013 WL 2448125 at *9-11, *citing McAllister v. Sec'y of Health & Human Servs.*, No. 91-103V, 1993 WL 777030 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995). In evaluating these factors, the undersigned has reviewed the entire record, including medical records, affidavits submitted by petitioner and others, and hearing testimony.

The undersigned may also look to prior pain and suffering awards to aid in her resolution of the appropriate amount of compensation for pain and suffering this case. *See, e.g., Jane Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (July 15, 2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case.") And, of course, the undersigned also may rely on her own experience adjudicating similar claims. *See Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.,* 109 Fed. Cl. 579 (2013).

### B. Facts and Circumstances of this Case

In the experience of the undersigned, awareness of suffering is not typically a disputed issue in cases involving a SIRVA. In this case, neither party has raised, nor is the undersigned aware of, any issue concerning petitioner's awareness of suffering and the undersigned finds that this matter is not in dispute. Thus, based on the circumstances of this case, the undersigned determines that petitioner had full awareness of her suffering and analyzes only the severity and duration of her suffering.

#### 1. Severity

The evidence in this case shows that petitioner suffered a mild to moderately painful shoulder injury, but suffered severe limitations in range of motion. She visited an orthopedic surgeon three weeks following her vaccination complaining of pain that was mild to moderate in severity and intermittent. She received a steroid injection at this time.

Petitioner underwent arthroscopic surgery for her shoulder injury approximately six weeks following her vaccination. Petitioner's surgery was performed under general anesthesia, and the operative report indicates that there was "significant labral pathology." Pet. Ex. 2 at 30, Pet. Ex. 3 at 22. Several procedures were performed. Petitioner experienced no complications during surgery and had a good outcome following extensive rehabilitation.

12

Petitioner had numerous physical therapy sessions over the course of five months in two different states. During this time, she rated her pain between 0-4 on a scale of 1-10. By late January 2016, petitioner was pain-free for extended periods of time. By early April 2016, petitioner appears to have been largely pain-free, and by mid-April 2016 she was able to play tennis again without difficulty.

While petitioner's pain levels during physical therapy were relatively mild, she suffered from severe limitations in her range of motion due to her injury. At her initial physical therapy evaluation on December 1, 2015, her passive range of motion in her right shoulder was 75 degrees in flexion, 75 degrees in abduction, zero degrees in external rotation, and ten degrees in internal rotation.[8] At a January 7, 2016 evaluation, petitioner's active range of motion in her right shoulder was 45 degrees in forward flexion and 42 degrees in abduction. In passive range of motion, her right shoulder was limited to 90 degrees in forward flexion, 68 degrees in abduction, and 25 degrees in external rotation. *Id.* On February 26, 2016, her active range of motion in her right shoulder had improved to 124 degrees in forward flexion and her passive range of motion was 162 degrees in forward flexion, 52 degrees in abduction, 55 degrees in external rotation, and 71 degrees in internal rotation.

On March 9, 2016, her active range of motion in her right shoulder was 115 degrees in flexion, 40 degrees in extension, 80 degrees in abduction, and 40 degrees in external rotation. *Id.* Her passive range of motion was 120 degrees in flexion and abduction, 45 degrees in external rotation, and 40 degrees in internal rotation. *Id.* Her strength was 3-/5 in her right shoulder in all planes. She reported difficulty performing tasks above her head such as reaching into a cabinet and brushing her hair.

On April 4, 2016, petitioner's range of motion had returned to within normal limits but she still had limitations in strength. By the time she completed physical therapy on April 29, 2016, she was assessed to have active range of motion in her right shoulder within functional limits and strength of 4+/5.

An additional factor increasing the severity in this is that petitioner underwent rehabilitation from her injury while caring for her terminally ill mother. During this time, the limitations of petitioner's injury caused distress about her ability to care for her mother, and her caretaking tasks appeared to have increased her pain levels. Petitioner's injury further impacted her playing in a tennis league and participating in an art co-op, both activities which she enjoyed and which were a significant part of her social life.

### 2. Duration

Petitioner's injury was of relatively brief duration for a SIRVA, based on the undersigned's experience in SIRVA cases. She was vaccinated in September 2015 and appears to have recovered by July 8, 2016. In addition, she was largely pain-free

---

[8] Normal range of motion for the shoulder is 180 degrees in flexion, 150 degrees in abduction, 90 degrees in external rotation, and 70-90 degrees in internal rotation.

13

by April 2016. This is likely attributable to the fact that she received surgical treatment soon after her injury and underwent extensive physical therapy.

Petitioner's limited range of motion continued until April 5, 2016 when she was found to have full passive range of motion and active range of motion within normal limits. Even then, her shoulder was limited in strength to 3/5. Thus, petitioner had limitations that affected her ability to engage in her usual activities for approximately seven to eight months.

### C. Prior Pain and Suffering SIRVA Decisions

There have been six reasoned decisions by the undersigned awarding damages in SIRVA cases where the parties were unable to informally resolve damages. Typically, the primary point of dispute has been the appropriate amount of compensation for pain and suffering. These decisions are:

- *Desrosiers v. Sec'y Health & Human Servs.*, No. 16-224V, 2017 WL 5507804 (Fed. Cl. Spec. Mstr. Sept. 19, 2017) (awarding $85,000.00 for pain and suffering and $336.20 in past unreimbursable medical expenses); and

- *Dhanoa v. Sec'y Health & Human Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $94,900.99 for pain and suffering and $862.14 in past unreimbursable medical expenses); and

- *Marino v. Sec'y Health & Human Servs.*, No. 16-622V, 2018 WL 2224736 (Fed. Cl. Spec. Mstr. Mar. 26, 2018) (awarding $75,000.00 for pain and suffering and $88.88 in unreimbursable medical expenses); and

- *Knauss v. Sec'y Health & Human Servs.*, No. 16-1372V, 2018 WL 3432906 (Fed. Cl. Spec. Mstr. May 23, 2018) (awarding $60,000.00 for pain and suffering and $170.00 in unreimbursable medical expenses); and

- *Collado v. Sec'y Health & Human Servs.*, No. 17-225V, 2018 WL 3433352 (Fed. Cl. Spec. Mstr. June 6, 2018) (awarding $120,000.00 for pain and suffering and $772.53 in unreimbursable medical expenses); and

- *Kim v. Sec'y Health & Human Servs.*, No. 17-418, (Fed. Cl. Spec. Mstr. July 20, 2018) (awarding $75,000.00 for pain and suffering and $520.00 for unreimbursable medical expenses) (available on court website, www.uscfc.uscourts.gov).

### D. Amount to be Awarded for Pain and Suffering in this Case

Based upon the record as a whole, the undersigned finds that the facts and circumstances in this case warrant an award of $125,000.00 for actual pain and suffering. The undersigned notes that petitioner in this case underwent a steroid

injection and surgery and required extensive rehabilitation, which occurred at a time when she was caring for her terminally ill mother.  Further, in this case petitioner's injury limited her participation in tennis and painting, two activities she enjoyed that provided physical activity, friendships, and social events.  While petitioner suffered a painful and limiting injury, she had a good result from surgery and intensive physical therapy and many of her symptoms resolved within six months of her vaccination.

Petitioner in this case has many similarities to the petitioner in *Collado*.  In both cases, petitioners underwent surgical repair of their shoulder injuries.  The petitioner in *Collado* had more severe pain levels, and suffered for longer before becoming pain-free.  However, the petitioner in this case had extenuating circumstances, caring for a terminally ill parent and losing important social and physical outlets, especially the fact that she missed joining her team at a state tournament because she was recovering from her injury, and later, due to her decreased playing ability, declined a spot on a team that ultimately went on to play in a state championship.

With respect to petitioner's request for future pain and suffering, the undersigned finds that petitioner has not met her burden to demonstrate that such an award is warranted.  Petitioner bears the burden of proof with respect to each element of compensation requested.  *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722 at *22-23 (Fed. Cl. Spec. Mstr. Mar, 18, 1996).  Contemporaneous medical records generally provide the most reliable supporting documentation of a medical condition and the effect it has on an individual's daily life.  *See Shapiro v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 532, 537-38 (2011) ("[t]here is little doubt that the decisional law in the vaccine area favors medical records created contemporaneously with the events they describe over subsequent recollections"), *citing United States v. U.S. Gypsum Co.*, 333 U.S. 364 (1948); *see also Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528-29 (Fed. Cir. 1993) (noting that medical records are generally contemporaneous to the medical events recorded and are generally trustworthy records).

In this case, the record shows that petitioner obtained significant relief from surgery and extensive physical therapy.  When she was discharged from physical therapy on April 29, 2016, petitioner's active range of motion was within functional limits and her strength had improved.  Petitioner has not provided medical records documenting continuing pain and suffering.  Thus, petitioner has not met her burden of establishing by preponderant evidence that she is entitled to an award for future pain and suffering.

In this case, the undersigned awards $125,000.00 for actual pain and suffering.

## V.    Conclusion

**For all of the reasons discussed above, and based on consideration of the record as a whole, the undersigned finds that $125,000.00 represents a fair and appropriate amount of compensation for petitioner's actual pain and suffering.  In addition, the undersigned finds that petitioner is entitled to compensation for $3,143.80 in past unreimbursable medical expenses.**

Based on the record as a whole and arguments of the parties, **the undersigned awards petitioner a lump sum payment of $128,143.80 in the form of a check payable to petitioner, Leslie Dobbins.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this decision.[9]

**IT IS SO ORDERED.**

                                            **s/Nora Beth Dorsey**
                                            Nora Beth Dorsey
                                            Chief Special Master

---

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.